USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 4/10/2020

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SANTO VALENZUELA ARIAS, EDSON LOUIS, JOB VELASQUEZ ESTRADA,

                *Petitioners*,

-against-

THOMAS DECKER, in his official capacity as Director of the New York Field Office of U.S. Immigrations & Customs Enforcement; and CHAD WOLF, in his official capacity as Acting Secretary, U.S. Department of Homeland Security,

                *Respondents*.

20 Civ. 2802 (AT)

**ORDER**

ANALISA TORRES, District Judge:

    Petitioners Santo Valenzuela Arias and Edson Louis are currently detained by Immigration and Customs Enforcement ("ICE") in the Essex County Correctional Facility ("Essex County Jail"), where cases of COVID-19 have been identified. Petition ¶¶ 2, 6, 7, ECF No. 1. Petitioner Job Velasquez Estrada had been detained there, but was released on April 7, 2020. *Id.* ¶ 8; TRO Mot. at 1 n.1, ECF No. 3.

    On April 8, 2020, Petitioners moved for a temporary restraining order ("TRO")[1] requiring Respondents—Thomas Decker, in his official capacity as Director of the New York Field Office of ICE and Chad Wolf, in his official capacity as Acting Secretary of the U.S. Department of Homeland Security—to (1) immediately release Valenzuela Arias and Louis from detention, subject to reasonable conditions, and (2) refrain from arresting Petitioners during the pendency of their immigration proceedings, in light of the public health crisis posed by COVID-19. *See* TRO Mot. at 1–2.

---

[1] Petitioners filed their motion for a TRO and memorandum in support in a single ECF document. To avoid confusion, the Court will cite to pages in the motion itself as "TRO Mot.," and to pages in the supporting memorandum of law as "TRO Mem."

For the reasons stated below, the TRO is GRANTED, and (1) Respondents and the Essex County Jail are ORDERED to release Petitioners upon satisfaction of conditions to be imposed by the Court, and (2) Respondents are RESTRAINED from arresting Petitioners for civil immigration detention purposes during the pendency of their immigration proceedings.

## BACKGROUND

Petitioners were detained by ICE in connection with removal proceedings pending at the Varick Street Immigration Court. Petition ¶¶ 6–8. They are housed in the Essex County Jail, where at least two detainees and at least 11 staff members have tested positive for COVID-19. *See* TRO Mem. at 1, 12; Ortiz Decl. ¶ 22, ECF No. 7. There are also seven confirmed cases among inmates at Delaney Hall Detention Facility, another facility that houses ICE detainees located across the street from the facility where Petitioners are being held. Ortiz Decl. ¶ 22; *see Delaney Hall Detention Facility*, U.S. Immigration and Customs Enforcement (Oct. 24, 2019), https://www.ice.gov/detention-facility/delaney-hall-detention-facility.

Each Petitioner suffers from medical conditions that place him at imminent risk of death or serious injury in immigration detention if exposed to COVID-19. As a result of rib and chest wall injuries, Louis, aged 37, suffers from breathlessness and chronic pain. Petition ¶ 6. Last week, after fainting and feeling ill, he was hospitalized and then returned to Essex County Jail. *Id.* Louis also suffers from post-traumatic stress disorder, depression, and anxiety. *Id.* Valenzuela Arias, aged 27, has a lump on the left side of his chest, which requires surgical removal. *Id.* ¶ 7. Velasquez Estrada, aged 32, was exposed to toxic inhalants as a child laborer, has been a lifelong smoker, and reports difficulty breathing; he was also diagnosed with a traumatic brain injury that impairs his mental faculties. *Id.* ¶ 8.

At 2:00 p.m. on April 9, 2020, the Court held a telephonic hearing on Petitioners' request for a TRO.

## DISCUSSION

I.     <u>Legal Standard</u>

"A plaintiff seeking a temporary restraining order must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Natera, Inc. v. Bio-Reference Labs., Inc.*, No. 16 Civ. 9514, 2016 WL 7192106, at *2 (S.D.N.Y. Dec. 10, 2016) (internal quotation marks, citation, and alteration omitted).

"It is well established that in this Circuit the standard for an entry of a TRO is the same as for a preliminary injunction." *Andino v. Fischer*, 555 F. Supp. 2d 418, 419 (S.D.N.Y. 2008) (collecting cases). "The showing of irreparable harm is perhaps the single most important prerequisite for a preliminary injunction." *CF 135 Flat LLC v. Triadou SPY N.A.*, No. 15 Civ. 5345, 2016 WL 2349111, at *1 (S.D.N.Y. May 3, 2016) (internal quotation marks, citations, and alteration omitted). Under this prong, the movant "must show that the injury it will suffer is likely and imminent, not remote or speculative, and that such injury is not capable of being fully remedied by money damages." *NAACP v. Town of E. Haven*, 70 F.3d 219, 224 (2d Cir. 1995). To satisfy this requirement, a movant must demonstrate "that he would suffer irreparable harm if the TRO does not issue." *Andino*, 555 F. Supp. 2d at 419. "The district court has wide discretion in determining whether to grant a preliminary injunction." *Almontaser v. N.Y.C. Dep't of Educ.*, 519 F.3d 505, 508 (2d Cir. 2008) (per curiam) (internal quotation marks and citation omitted).

II.  Analysis

   A. Severance

Respondents argue that the petition should be severed into separate habeas actions for each Petitioner. Resp. Opp. at 21–23, ECF No. 9. Severance of the petition at the TRO stage would be inappropriate, however, given the equities and judicial energy spent considering the parties' submissions. *See Coronel v. Decker*, 20 Civ. 2472, 2020 WL 1487274, at *2 (S.D.N.Y. Mar. 27, 2020) ("Considerations of judicial economy—the [c]ourt has already read and digested the record and heard lengthy oral argument on this motion—and the urgent need to timely decide [p]etitioners' motion for a temporary restraining order in light of the immediate risk to the health of the [p]etitioners counsel against severance at this juncture."); *see also id.*, ECF No. 35 at 3 (S.D.N.Y. Apr. 1, 2020) (denying without prejudice the respondents' motion to sever the joint petition after receiving further briefing).

In any event, the Court rejects Respondents' argument on the merits. A single habeas action is appropriate, because the alleged health risks posed by COVID-19 and the constitutional claims presented do not turn on facts unique to each Petitioner. *Cf. Bob v. Decker,* No. 19 Civ. 8226, ECF No. 4 at 3 (S.D.N.Y. Oct. 15, 2019) (requiring three *pro se* petitioners to proceed in three separate habeas actions, because the petitioners each alleged that they were denied a different type of medical care). Rather, Petitioners raise almost identical questions of law and fact, including whether Respondents are adequately protecting Petitioners from contracting COVID-19, whether Respondents are deliberately indifferent to Petitioners' medical needs, and whether release from detention is justified under these circumstances. *See* Petition; *United States ex rel. Sero v. Preiser*, 506 F.2d 1115, 1125–26 (2d Cir. 1974) (finding that, where a

constitutional violation was applicable across multiple petitioners, the action was "uncluttered by subsidiary issues" and a multi-party habeas was appropriate).

This circuit is not without precedent on multi-party habeas actions. In *United States ex rel. Sero v. Preiser*, the Second Circuit considered a proposed habeas corpus class action brought by adult misdemeanants who were imprisoned in a state institution, on behalf of themselves and all other young adult misdemeanants who had been sentenced to longer terms than they would have received had they been adults. 506 F.2d at 1119. The court of appeals held that a "multi-party proceeding similar to the class action authorized by [Rule 23 of the Federal Rules] of Civil Procedure" was permissible, because the judiciary has the inherent authority under the All Writs Act, 28 U.S.C. § 1651, to fashion "expeditious methods of procedure in a specific case." *Id.* at 1125 (citing *Harris v. Nelson*, 394 U.S. 286, 294 (1969)); *see also Bertrand v. Sava*, 684 F.2d 204, 219 (2d Cir. 1982) (finding no error in the district court's ruling on the motion to "certify a [habeas] class of 'all Haitian aliens transferred from [an Immigration and Naturalization Service facility] . . . , who have requested political asylum and parole, but have remained in respondent's custody'" (citation omitted)). Here, Petitioners allege shared harms, including the alleged systemic failure of Respondents to identify and protect individuals in the Essex County Jail who are at high risk of complications from COVID-19. If there were ever an extraordinary circumstance warranting a multi-party habeas petition to allow for expeditious resolution of the claims before the Court, it would be this case.

The Court concludes that considerations of "judicial economy and fairness argue persuasively for the construction of a procedure" such as this one, where Petitioners "shar[e] certain complaints about the legality" of their confinement. *Bertrand v. Sava*, 535 F. Supp. 1020, 1024 (S.D.N.Y. 1982) (citations omitted), *rev'd on other grounds*, 684 F.2d 204 (2d Cir. 1982);

*see also id.* at 1024–25 ("Such initiative and flexibility are essential to modern use of the writ [of habeas corpus] in order to cut through barriers of form and insure that miscarriages of justice are corrected."). The Court, therefore, will permit Petitioners to proceed in this action jointly.

B. Irreparable Harm

In the Second Circuit, a "showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Faiveley Transport Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (internal quotation marks and citations omitted). That harm must be "actual and imminent" rather than speculative. *Id.*

Petitioners have shown irreparable harm by establishing that continued detention in the Essex County Jail poses a serious threat to their health and to their constitutional rights.

1. Risk of Death

By now, the extraordinary scope and severity of the COVID-19 health crisis is clear to everyone. On March 11, 2020, the World Health Organization declared COVID-19 a global pandemic. Petition ¶ 26. As of the date of this opinion, there are more than 1.6 million confirmed cases worldwide, with almost half a million cases in the United States. Center for Systems Science and Engineering at Johns Hopkins University, *Coronavirus COVID-19 Global Cases*, Coronavirus Resource Center (Apr. 10, 2020), https://coronavirus.jhu.edu/map.html. Some 97,264 people have died from the disease worldwide; at least 5,150 have died in New York City, all in the course of a few weeks. *Id.* New York is recognized as a global epicenter for the pandemic. Petition ¶ 29. New Jersey also has a significant outbreak of the virus, with 54,588 confirmed cases, and 1,932 deaths. New Jersey Dep't of Health, *New Jersey COVID-19 Dashboard*, Official Site of the State of New Jersey (Apr. 10, 2020),

https://www.nj.gov/health/cd/topics/covid2019_dashboard.shtml. 6,580 of those cases are in Essex County, where Petitioners are housed; the county has had 352 deaths. *Id.*

The nature of detention facilities makes exposure and spread of the virus particularly harmful. Jaimie Meyer, M.D., M.S., who has worked extensively on infectious disease treatment and prevention in the context of jails and prisons, recently submitted a declaration in this district noting that the risk of COVID-19 to people held in New York-area detention centers, including the Essex County Jail, "is significantly higher than in the community, both in terms of risk of transmission, exposure, and harm to individuals who become infected." Meyer Decl. ¶ 7, *Velesaca v. Wolf*, 20 Civ. 1803 (S.D.N.Y. Feb. 28, 2020), ECF No. 42. Moreover, "[i]t is nearly impossible to prevent widespread infections inside the Essex County Jail because detainees live, sleep, and use the bathroom in close proximity with others, and because 'behind bars, some of the most basic disease prevention measures are against the rules or simply impossible.'" Petition ¶ 46 (citation and alteration omitted).

COVID-19 poses a serious risk to Petitioners' health. Louis and Velasquez Estrada both suffer from chronic difficulty breathing; Valenzuela Arias has an unexplained mass in his chest that requires surgery. *Id.* ¶¶ 6–8. For people with underlying health problems like these, COVID-19 causes severe medical conditions and has increased lethality. *Groups at Higher Risk for Severe Illness*, Centers for Disease Control and Prevention (Apr. 2, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html ("Based on what we know now, those at high-risk for severe illness from COVID-19 are . . . [p]eople of all ages with underlying medical conditions, particularly if not well controlled, including . . . [p]eople with chronic lung disease or moderate to severe asthma" and "[p]eople who are immunocompromised" by "cancer treatment" and "smoking"); *see* Fed. R. Evid. 201(b)

7

("The court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned."); *Brickey v. Superintendent, Franklin Corr. Facility*, No. 10 Civ. 085, 2011 WL 868148, at *2 n.3 (N.D.N.Y. Feb. 17, 2011) (taking judicial notice of the meaning and symptoms of sciatica), *report and recommendation adopted*, 2011 WL 868087 (N.D.N.Y. Mar. 10, 2011); *Lin v. Metro. Life Ins. Co.*, No. 07 Civ. 03218, 2010 WL 668817, at *1 (S.D.N.Y. Feb. 25, 2010) ("In its decision, the Court took judicial notice of certain medical background information about Hepatitis B.").

A number of courts in this district and elsewhere have recognized the threat that COVID-19 poses to individuals held in jails and other detention facilities. *See, e.g.*, *United States v. Roberts*, No. 18 Cr. 528-5, 2020 WL 1700032, at *1 (S.D.N.Y. Apr. 8, 2020) ("[A]n inmate in . . . a dense urban jail in which several inmates have tested positive for COVID-19 . . . faces a particularly grave danger of contracting the disease."); *United States v. Butler*, No. 19 Cr. 834-10, 2020 WL 1689778, at *2 (S.D.N.Y. Apr. 7, 2020) ("COVID-19 presents a heightened risk for incarcerated defendants . . . with respiratory and cardiac ailments. . . . [T]he crowded nature of federal detention centers such as the MDC present an outsize risk that the COVID-19 contagion, once it gains entry, will spread."); *United States v. Ramos*, No. 14 Cr. 484, 2020 WL 1685812, at *2 (S.D.N.Y. Apr. 7, 2020) ("Courts have . . . recognized that individuals in confinement settings may be at a heightened risk of contracting COVID-19." (internal quotation marks and citation omitted)); *United States v. Stephens*, No. 15 Cr. 95, 2020 WL 1295155, at *2 (S.D.N.Y. Mar. 19, 2020) ("[I]nmates may be at a heightened risk of contracting COVID-19 should an outbreak develop.") (collecting authorities); *United States v. Garlock*, 18 Cr. 418, 2020 WL 1439980, at *1 (N.D. Cal. Mar. 25, 2020) ("By now it almost goes without saying that we should not be

adding to the prison population during the COVID-19 pandemic if it can be avoided. Several recent court rulings have explained the health risks—to inmates, guards, and the community at large—created by large prison populations. The chaos has already begun inside federal prisons—inmates and prison employees are starting to test positive for the virus, quarantines are being instituted, visits from outsiders have been suspended, and inmate movement is being restricted even more than usual." (citations omitted)). Addressing the situation in New Jersey specifically, the New Jersey Supreme Court has held that "reduction of county jail populations, under appropriate conditions, is in the public interest to mitigate risks imposed by COVID-19" in light of "the profound risk posed to people in correctional facilities arising from the spread of COVID-19," and has ordered the release of many individuals serving sentences in New Jersey county jails. *In the Matter of the Request to Commute or Suspend County Jail Sentences*, Case No. 84230 (N.J. Mar. 22, 2020).

Though ICE and the Essex County Jail have taken some steps to mitigate the spread of COVID-19, the risk of Petitioners' infection is still very real. According to a declaration submitted by the Director of the Essex County Jail, the facility has implemented measures such as suspending classes for detainees, providing information to staff and detainees about the importance of handwashing and other ways to reduce the spread of COVID-19, increasing supplies, requiring detainees to eat in their "pods" rather than in a larger common dining area, performing temperature checks on incoming detainees, disallowing all visitation by family and friends, and reducing the number of detainees who can take recreation at the same time. Ortiz Decl. ¶¶ 15, 16. These measures likely result in some reduction of risk of infection, but they are far from sufficient. As declarants in support of Petitioners' application attest, the facility still sees: large numbers of detainees congregating in common areas where there is no room to

9

socially distance, detainees who fall ill remaining in the general population, and surfaces like tablets and phones that are touched by numerous persons not being regularly cleaned. Pena Decl. ¶¶ 4, 6–9, ECF No. 3-2, Picasso Decl. ¶¶ 4, 5, 8, ECF No. 3-3. The Essex County Jail also "cohorts" detainees who have been exposed to individuals who have tested positive for COVID-19—that is, houses them together with one another, and separate from the rest of the population. Ortiz Decl. ¶ 20. But cohorting in this manner does nothing to stop the spread of untested cases; indeed, in some situations, it might exacerbate the spread of disease, as asymptomatic but infected detainees mingle with uninfected ones. Such a practice is not in compliance with Centers for Disease Control and Prevention ("CDC") guidelines, which recommend that "[o]nly individuals who are laboratory confirmed COVID-19 cases should be placed under medical isolation as a cohort. Do not cohort confirmed cases with suspected cases or case contacts." *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, Centers for Disease Control and Prevention (Apr. 9, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html. In other words, the CDC recommends cohorting individuals that *are* infected; not individuals that *may or may not* be infected. *See* Isolation Precautions, Centers for Disease Control and Prevention (July 22, 2019), https://www.cdc.gov/infectioncontrol/guidelines/isolation/index.html.

The facility reports that it acquired 50 testing kits, Ortiz Decl. ¶ 16(a), but it is not clear how those kits can be used effectively to protect a jail population of close to 2,000, *id.* ¶ 4. Additionally, the Essex County Jail does not provide gloves or masks to detainees unless the detainee exhibits symptoms of COVID-19. *See* Ortiz Decl. ¶ 17. And although such a precaution may prevent the spreading of the virus, it does nothing to help the detainee who has

already been infected, and it does nothing to prevent transmission from asymptomatic individuals, or those who are not forthcoming about their symptoms.

Courts have recognized the health risk posed by COVID-19 to be particularly acute for detainees who have underlying illnesses. *See Jones v. Wolf*, No. 20 Civ. 361, 2020 WL 1643857, at *13 (W.D.N.Y. Apr. 2, 2020) ("[P]etitioners with the CDC-identified vulnerabilities face a grave, irreparable risk to their health and safety if they remain confined under current conditions" in a facility where COVID-19 is spreading); *United States v. Martin*, No. 19 Cr. 140-13, 2020 WL 1274857, at *2 (D. Md. Mar. 17, 2020) ("[T]he Due Process Clauses of the Fifth or Fourteenth Amendments, for federal and state pretrial detainees, respectively, may well be implicated if defendants awaiting trial can demonstrate that they are being subjected to conditions of confinement that would subject them to exposure to serious (potentially fatal, if the detainee is elderly and with underlying medical complications) illness.").

Thus, courts in this district have held that vulnerable individuals in immigration detention face irreparable harm to their health from COVID-19, and are entitled to habeas relief. *See Coronel*, 2020 WL 1487274, at *3 ("Due to their serious underlying medical conditions, all Petitioners face a risk of severe, irreparable harm if they contract COVID-19. . . . [B]eing in immigration detention places Petitioners at significantly higher risk of contracting COVID-19. Individuals in carceral settings are at a 'significantly higher' risk of spreading infectious diseases." (citation omitted)); *Basank v. Decker*, 20 Civ. 2518, 2020 WL 1481503, at *4 ("The risk that Petitioners will face a severe, and quite possibly fatal, infection if they remain in immigration detention constitutes irreparable harm warranting a TRO.").

Petitioners' continued confinement in immigration detention poses a significant risk that they will contract COVID-19, and Petitioners' infection with COVID-19 would almost certainly

11

cause severe—or fatal—damage to their health. Such an injury constitutes irreparable harm and justifies the issuance of a TRO. *See Shapiro v. Cadman Towers, Inc.*, 51 F.3d 328, 332 (2d Cir. 1995) (upholding finding of irreparable injury "premised . . . upon [the district court's] finding that [plaintiff] was subject to risk of injury, infection, and humiliation"); *Mayer v. Wing*, 922 F. Supp. 902, 909 (S.D.N.Y. 1996) ("[T]he deprivation of life-sustaining medical services . . . certainly constitutes irreparable harm.").

2. Constitutional Violations

Second, Petitioners have also shown irreparable injury because, as discussed below, they face a violation of their constitutional rights. In the Second Circuit, it is well-settled that an alleged constitutional violation constitutes irreparable harm. *See, e.g.*, *Connecticut Dep't of Envtl. Prot. v. O.S.H.A.*, 356 F.3d 226, 231 (2d Cir. 2004) ("[W]e have held that the alleged violation of a constitutional right triggers a finding of irreparable injury." (internal quotation marks and citations omitted)); *Statharos v. New York City Taxi & Limousine Comm'n*, 198 F.3d 317, 322 (2d Cir. 1999) ("Because plaintiffs allege deprivation of a constitutional right, no separate showing of irreparable harm is necessary."); *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996) (clarifying that "it is the alleged violation of a constitutional right that triggers a finding of irreparable harm" and a substantial likelihood of success on the merits of a constitutional violation is not necessary); *Sajous v. Decker*, No. 18 Civ. 2447, 2018 WL 2357266, at *12 (S.D.N.Y. May 23, 2018) (finding that immigration detainee established irreparable injury by alleging that prolonged immigration detention violated his constitutional due process rights).

The Court finds, therefore, that Petitioners have established the threat of irreparable harm absent a TRO.

C. Likelihood of Success on the Merits

The Court concludes that Petitioners have met their burden of showing a likelihood of success on the merits. Petitioners argue that their remaining in an ICE detention center where COVID-19 is present and without adequate protection for their health violates their due process rights. TRO Mem. at 8. The Court agrees.

The Due Process Clause of the Fifth Amendment to the United States Constitution forbids the government from depriving a person of life, liberty, or property without due process of law. The protection applies to "all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001). An application for habeas corpus under 28 U.S.C. § 2241 is the appropriate vehicle for an individual in federal custody to challenge conditions or actions that pose a threat to his medical wellbeing. *See Roba v. United States*, 604 F.2d 215, 218–19 (2d Cir. 1979) (allowing a § 2241 application to challenge an inmate's "transfer while seriously ill" where that transfer posed a risk of fatal heart failure).

Immigration detainees can establish a due process violation for unconstitutional conditions of confinement by showing that a government official "knew, or should have known" of a condition that "posed an excessive risk to health," and failed to take appropriate action. *Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017); *Charles v. Orange Cty.*, 925 F.3d 73, 87 (2d Cir. 2019) ("Deliberate indifference . . . can be established by either a subjective or objective standard: A plaintiff can prove deliberate indifference by showing that the defendant official recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, *or should have known*, that the condition posed an excessive risk to the plaintiff's health or safety." (internal quotation marks,

citation, and alterations omitted)). The risk of contracting COVID-19 in tightly-confined spaces, especially jails, remains "exceedingly obvious." *Basank*, 2020 WL 1481503, at *5; *see United States v. Gross*, No. 15 Cr. 769, 2020 WL 1673244, at *1 (S.D.N.Y. Apr. 6, 2020) (collecting cases). The Supreme Court has recognized that government authorities may be deemed "deliberately indifferent to an inmate's current health problems" where authorities "ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year," including "exposure of inmates to a serious, communicable disease," even when "the complaining inmate shows no serious current symptoms." *Helling v. McKinney*, 509 U.S. 25, 33 (1993). Petitioners need not demonstrate that "they actually suffered from serious injuries" to show a due process violation. *Darnell*, 849 F.3d at 31; *see Helling*, 509 U.S. at 33. Instead, showing that the conditions of confinement "pose an unreasonable risk of serious damage to their future health" is sufficient. *Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002) (quoting *Helling*, 509 U.S. at 35) (alteration omitted).

Petitioners have established that Respondents have left in place conditions of confinement that make COVID-19 an unreasonable risk of serious damage to their health. The measures that ICE and the Essex County Jail have taken fail to adequately safeguard Petitioners' health in two crucial ways. First, protection of high-risk detainees appears to be limited to "daily monitoring of these inmates and detainees and the establishment of a plan to remove the inmates from the rest of the population should the need arise." Ortiz Decl. ¶ 15(f). It is not at all clear—and at yesterday's hearing Respondents could not clarify—what the specifics of this "daily monitoring" entail. But for detainees with underlying conditions like Petitioners', monitoring them for signs of infection is too little, too late. The best, and perhaps only, way to protect them is to prevent infection in the first place. Respondents have not taken meaningful steps to do so.

Second, conditions in the Essex County Jail plainly do not allow for the social distancing measures recommended by the CDC—most obviously, maintaining *at least* six feet of distance from other persons at all times. *See How to Protect Yourself*, Centers for Disease Control and Prevention (Apr. 8, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prepare/prevention.html. To the contrary, Respondents conceded at oral argument that detainees sleep in bunk beds, necessarily putting them within six feet of one another for sustained periods of time. *See also* Picasso Decl. ¶ 6 ("I was really scared of getting COVID-19. We also slept very close together—two people in a small room with bunk beds."); Ortiz Decl. ¶ 6 (failing to indicate that any of the bunk beds were at least six feet apart from each other). Moreover, Petitioners have presented compelling evidence that detainees congregate in recreational areas, showers, and phone banks that do not allow for spacing. Pena Decl. ¶ 4 ("My dorm contained about 64 people with two people assigned to share a room. There were only 2 bathrooms and 8 telephones in the entire unit to be shared by 64 people. . . . [T]he dorms weren't big enough for us to stay away from people and we would still come into contact with them – people would group in lines waiting for the phones and bathrooms. It was impossible to stay away from people even if I wanted to because the room just wasn't big enough."), ¶ 5 ("The situation worsened as time went on because we would be in our cells for 6 to 9 hours at a time, but we still came into contact with other people when we left the cells. The jail also stopped giving us utensils to eat our food and we had to eat with our fingers."); Picasso Decl. ¶¶ 4, 5, 8 ("When we needed to make phone calls, there were eight phones for all 64 of us to use. They only cleaned the phones once per day, which made me nervous because so many people were using them back to back."), ¶ 9 ("The jail did not provide access to hand sanitizer, masks, or gloves. There were some officers that wore

masks, but some did not. The things we all used in jail in the common areas like phones and bathrooms were not sanitized between uses.").[2]

A number of courts in this district and beyond have held that habeas petitioners have demonstrated a likelihood of success under similar conditions. In *Basank*, this Court ordered immediate release of ten individuals detained in ICE custody at county jails in New Jersey, including the Essex County Jail. 2020 WL 1481503, at *4. The *Basank* petitioners suffered from underlying illnesses including asthma, obesity, and respiratory problems, and like Valenzuela Arias, one of the *Basank* petitioners also required prompt surgery. *Id.* at *1. The Court's holding that "[c]onfining vulnerable individuals . . . without enforcement of requisite social distancing and without specific measures to protect their delicate health poses an unreasonable risk of serious damage to their future health, and demonstrates deliberate indifference," applies with equal force here. *Id.* at *5 (internal quotation marks, citation, and alteration omitted).

In *Coronel*, another court in this district ordered the immediate release of seven individuals detained in ICE custody at a county jail in New Jersey, due to their underlying medical conditions, which include obesity, hypertension, and gastrointestinal problems. 2020 WL 1487274, at *1, *10. As in *Coronel*, "ICE has not taken any action to address the particular risks COVID-19 poses to high-risk individuals like the Petitioners here." *Id.* at *4. Likewise, in *Avendaño Hernandez v. Decker*, a court in this district held that an immigration detainee had established a "substantial claim for deliberate indifference" where ICE and the county jail in which he was held had "not taken any action to address the particular risks that COVID-19 poses

---

[2] After initially informing the Court at oral argument that Respondents did not know whether ICE sanitized phones between uses, Respondents subsequently stated at the hearing that ICE does do so. Accepting the representations of Respondents as true for purposes of this order, the Court nonetheless concludes that the balance of conditions described in Picasso's declaration clearly run counter to CDC guidance, and are highly dangerous to Petitioners' health, even if phones are now being sanitized.

16

to high-risk individuals," but rather had taken "only generalized proactive measures to prevent detainees within [their] care from contracting and spreading the virus." No. 20 Civ. 1589, 2020 WL 1547459, at *2–3 (S.D.N.Y. Mar. 31, 2020).

Courts in other districts have also found that ICE detainees have shown a likelihood of success on their claims that continued confinement, without adequate protection for their health, violates their due process rights. In *Hope v. Doll*, a court granted the immediate release of 22 immigration detainees held at facilities with reported COVID-19 cases, finding that "the protective measures in place . . . are not working." No. 20 Civ. 562, ECF. No. 11 at 13 (M.D. Pa. Apr. 7, 2020). As the court explained, "[i]t now seems that our worst fears have been realized— COVID-19 is spreading, and not nearly enough is being done to combat it. We cannot allow the [p]etitioners before us, all at heightened risk for severe complications from COVID-19, to bear the consequences of ICE's inaction." *Id.* at 19. A court in that same district released 13 individuals from ICE detention, who suffered from medical conditions such as high blood pressure, diabetes, asthma, and trouble breathing. *Thakker v. Doll*, No. 20 Civ. 480, 2020 WL 1671563, at *1, *10 (M.D. Pa. Mar. 31, 2020). In finding that the petitioners had shown a likelihood of success on the merits, the court noted that the petitioners had demonstrated that, "despite their best efforts, they cannot practice these effective preventative measures in [detention] [f]acilities." *Id.* at *8. "Considering . . . the grave consequences that will result from an outbreak of COVID-19, particularly to the high-risk [p]etitioners in this case," the court determined that it "cannot countenance physical detention in such tightly-confined, unhygienic spaces." *Id.*

Even when taking into consideration steps taken by ICE to prevent the spread of COVID-19, courts have found that high-risk petitioners have demonstrated a likelihood of success on

their due process claims. In *Malam v. Adducci*, the court released an ICE detainee, notwithstanding the precautionary measures taken by the facility, because the petitioner was "not ensured anything close to reasonable safety." No. 20 Civ. 10829, 2020 WL 1672662, at *12 (E.D. Mich. Apr. 5, 2020), *as amended* (Apr. 6, 2020) (internal quotation marks and citation omitted). The court found that "the only reasonable response by [r]espondents is the release of [p]etitioner; any other response demonstrates a disregard of the specific, severe, and life-threatening risk to [p]etitioner from COVID-19." *Id.*

The same rationale applies here. The measures taken by Respondents to combat COVID-19 should not be gainsaid, slow though they have been, and they may help protect some detainees.[3] But Respondents know, or should know, that these steps are not enough to protect vulnerable detainees like Petitioners from an unreasonable risk of serious damage to their health. The Court holds, therefore, that Petitioners are likely to succeed on the merits of their due process claim.[4]

### D. Balance of Equities and Public Interest

The equities and public interest weigh heavily in Petitioners' favor. First, Petitioners face irreparable injury—to their constitutional rights and to their health.

---

[3] The Court observes, however, that ICE's response has been astonishingly slow in light of the fast-moving emergency posed by COVID-19. In an internal email, Peter B. Berg, the Assistant Director of ICE Field Operations, directed ICE Field Office Directors and Deputy Field Office Directors to review the cases of individuals "detained in your area of responsibility" who may be at high risk for COVID-19 complications. ECF No. 8-1. This email was sent on Saturday, April 4, 2020, at 5:17 p.m. *Id.* at 1. The President of the United States had declared a state of national emergency over three weeks prior to Berg's directive. *See* Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak (Mar. 13, 2020), https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak. The delay is unexplained and suggestive of deliberate indifference to the risk COVID-19 posed to those in ICE custody. *See Charles*, 925 F.3d at 87 ("Whether the state knew or should have known of the substantial risk of harm to the detainee is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence.").

[4] The Court does not reach Petitioners' additional argument that they are likely to succeed on the merits of the claim that their due process rights were violated because their current conditions of confinement are punitive. TRO Mem. at 8–9.

Second, the potential harm to Respondents is limited. As will be discussed below, the Court will allow Petitioners' release only on conditions sufficient to ensure public safety and their continued appearance at immigration proceedings. The Court is confident that, with those conditions imposed, Respondents' interest in Petitioners' continued participation in immigration proceedings will be assured.

Respondents note that Valenzuela Arias is mandatorily detained pursuant to 8 U.S.C. § 1226(c) on the basis of a prior criminal conviction for sale of a controlled substance. Hernandez Decl. ¶ 16, ECF No. 8. However, courts have the authority to order those detained in violation of their due process rights released, notwithstanding § 1226(c). *See Cabral v. Decker*, 331 F. Supp. 3d 255, 259 (S.D.N.Y. 2018) (collecting cases). Thus, Respondents have failed to justify Petitioners' continued detention in unsafe conditions.

Finally, the public interest favors Petitioners' release. During a deadly pandemic, the continued confinement of individuals being held to ensure that they appear at their immigration proceedings—not as punishment for any crime or with the primary aim of protecting public safety—does not serve the public's interest. *See* Declaration of Homer Venters, M.D. ¶ 12, *Fraihat v. U.S. Imm. and Customs Enforcement*, 5:19 Civ. 1546, ECF No. 81-11 (C.D. Cal. Mar. 24, 2020) (opining that "the design and operation of detention settings promotes the spread of communicable diseases such as COVID-19"); Declaration of Carlos Franco-Paredes, M.D., *id.* at ECF No. 81-12 at 1 ("Immigration detention centers in the U.S. are tinderboxes for the transmission of highly transmissible infectious pathogens including the SARS-CoV-2, which causes COVID-19. Given the large population density of immigration detention centers and the ease of transmission of this viral pathogen, the attack rate inside these centers will take exponential proportions, consuming significant medical and financial resources."); *Urgent action*

*needed to prevent COVID-19 "rampaging through places of detention"* – *Bachelet*, UNHCR (Mar. 25, 2020), https://www.ohchr.org/en/NewsEvents/Pages/DisplayNews.aspx?NewsID=25745&LangID=e (United Nations High Commissioner for Human Rights urging that detention of people in jails "should be a measure of last resort, particularly during this crisis"). It continues to be the case that "public health and safety are served best by rapidly decreasing the number of individuals detained in confined, unsafe conditions." *Basank*, 2020 WL 1481503, at * 6.

## CONCLUSION

For the reasons stated above, the TRO is GRANTED. Respondents and the Essex County Jail are ORDERED to release Petitioners upon satisfaction of conditions to be imposed by the Court. It is further ORDERED that the parties shall meet and confer, and, by **12:00 p.m.** on **April 11, 2020**, propose reasonable conditions of release for each Petitioner.

Respondents are RESTRAINED from arresting Petitioners for civil immigration detention purposes during the pendency of their immigration proceedings.

The TRO will expire on **April 24, 2020**, at **7:15 p.m.** No later than **April 16, 2020**, Respondents must show cause why the TRO should not be converted to a preliminary injunction. Petitioners may file a response no later than **April 22, 2020**.

The Clerk of Court is directed to terminate the motion at ECF No. 3.

SO ORDERED.

Dated: April 10, 2020, at 7:15 p.m.
New York, New York

_____
ANALISA TORRES
United States District Judge