UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SANTO VALENZUELA ARIAS, EDSON
LOUIS, JOB VELASQUEZ ESTRADA,

<em>Petitioners</em>,

-against-

THOMAS DECKER, in his official capacity as
Director of the New York Field Office of U.S.
Immigrations & Customs Enforcement; and
CHAD WOLF, in his official capacity as Acting
Secretary, U.S. Department of Homeland
Security,

<em>Respondents</em>.

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:   5/8/2020
```

20 Civ. 2802 (AT)

**OPINION
AND ORDER**

ANALISA TORRES, District Judge:

Petitioners, Santo Valenzuela Arias and Edson Louis, were detained by Immigration and

Customs Enforcement ("ICE") in the Essex County Correctional Facility ("Essex County Jail")

in New Jersey, where cases of COVID-19 have been identified.[1]  Petition ¶ 2, ECF No. 1.

Petitioners filed a petition for a writ of habeas corpus under 28 U.S.C. § 2241, requesting release

from ICE custody because of the public health crisis posed by COVID-19.  *See* Petition.

Petitioners also submitted an application for a temporary restraining order ("TRO") and

preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure, seeking an

order (1) releasing them on their own recognizance, subject to reasonable and appropriate

conditions, and (2) restraining Respondents, Thomas Decker, as Director of the New York Field

Office of ICE, and Chad Wolf, as Acting Secretary of the U.S. Department of Homeland

Security, from arresting Petitioners for civil immigration detention purposes during the pendency

of their immigration proceedings.  TRO Mem. at 1, ECF No. 3.

---

[1] The Petition included a third Petitioner, Job Velasquez Estrada. *See* Petition ¶ 8.  Respondents released Velasquez Estrada on April 7, 2020, prior to the issuance of the TRO. *See* TRO at 1.  Accordingly, in this order, "Petitioners" refers only to Valenzuela Arias and Louis.

The Court granted the TRO, and directed Respondents to show cause why it should not be converted into a preliminary injunction. *Valenzuela Arias v. Decker*, No. 20 Civ. 2802, 2020 WL 1847986, at \*9–10 (S.D.N.Y. Apr. 10, 2020). For the reasons stated below, Petitioners' request for a preliminary injunction is GRANTED as follows: (1) Petitioners shall remain released, subject to the conditions set by the Court, *see* ECF Nos. 20, 21, and (2) Respondents are RESTRAINED from arresting Petitioners for civil immigration detention purposes unless Respondents first obtain the Court's permission.

## BACKGROUND

Petitioners were detained by ICE in connection with removal proceedings pending at the Varick Street Immigration Court. Petition ¶¶ 6, 7. They were housed in the Essex County Jail, where as of May 4, 2020, at least three detainees, 83 correction officers, and three civilian staff members have been diagnosed with COVID-19. Ortiz Decl. ¶ 31, ECF No. 33-1.

Each Petitioner suffers from chronic medical conditions, and faces an imminent risk of serious injury or death if exposed to COVID-19. As a result of rib and chest wall injuries, Louis, age 37, suffers from breathlessness and chronic pain. Petition ¶ 6. Shortly before his release, after feeling ill and fainting, he was hospitalized and then returned to the Essex County Jail. *Id.* Louis also suffers from post-traumatic stress disorder, depression, and anxiety. *Id.* Valenzuela Arias, age 27, has a lump on the left side of his chest, which requires surgical removal. *Id.* ¶ 7. Petitioners represent that the lump is caused by gynecomastia, which results from a hormone imbalance that can be associated with testicular tumors, liver disease, and hyperthyroidism, among other conditions. Pet. Reply at 10, ECF No. 31.

Petitioners moved for a TRO on April 8, 2020. ECF No. 3. The Court held a telephonic hearing on April 9, 2020, *see* April 9, 2020 minute entry, and on April 10, 2020, entered a TRO

ordering Petitioners' release, *Valenzuela Arias*, 2020 WL 1847986, at *9–10.  The Court

extended the TRO for good cause for an additional fourteen days in order to consider the parties'

submissions on the question of whether the TRO should be converted to a preliminary injunction.

ECF No. 32.[2]  The Court now addresses, in turn, Respondents' argument that the action should

be severed into three individual proceedings, the question of venue, and the merits of Petitioners'

request for a preliminary injunction.

## DISCUSSION

I.     Severance

Consistent with its decision at the TRO stage, the Court remains unpersuaded by

Respondents' argument that the petition should be severed into separate habeas actions.

*Valenzuela Arias*, 2020 WL 1847986, at *2–3; Resp. Opp. at 13–14, ECF No. 28.

The Court denied Respondents' request to sever Petitioners' claims for two reasons.  First,

the Court concluded that severance is inappropriate on the grounds of judicial economy and

fairness.  *Id.* at *2.  Courts in this district have relied on this principle to deny the Government's

request to sever a number of multi-party habeas petitions similar to this one.  *See Coronel v.*

*Decker*, 20 Civ. 2472, 2020 WL 1487274, at *2 (S.D.N.Y. Mar. 27, 2020) (severance denied

because "the [c]ourt has already read and digested the record and heard lengthy oral argument on

this motion—and the urgent need to timely decide [p]etitioners' motion for a temporary

restraining order in light of the immediate risk to the health of the [p]etitioners counsel against

severance at this juncture."); *Basank v. Decker*, No. 20 Civ. 2518, 2020 WL 1953847, at *3

(S.D.N.Y. Apr. 23, 2020) (denying respondents' request to sever a similar action brought by

---

[2] The Court concludes that the record is sufficient to resolve the matter without an evidentiary hearing.  *See Charette v. Town of Oyster Bay*, 159 F.3d 749, 755 (2d Cir. 1998) ("An evidentiary hearing is not required when the relevant facts either are not in dispute . . . or when the disputed facts are amenable to complete resolution on a paper record." (citations omitted)).

petitioner-detainees); *Coronel*, 20 Civ. 2472, ECF No. 35 at 3 (S.D.N.Y. Apr. 1, 2020) (denying

without prejudice respondents' motion to sever the joint petition after receiving further briefing).

The amount of effort expended by this Court has only increased since the TRO stage, and

splitting Petitioners' claims now would create even greater inequity.

Second, the Court concluded that a single habeas action is merited because this matter is

"uncluttered by subsidiary issues."  *United States ex rel. Sero v. Preiser*, 506 F.2d 1115, 1125–

26 (2d Cir. 1974); TRO at 4–5.  In *Sero*, the Second Circuit considered a proposed habeas corpus

class action brought by young adult misdemeanants (ages 16 to 21), on behalf of themselves and

all others similarly situated, who were serving a reformatory sentence in excess of the adult

penalty for the same misdemeanor.  *Id.* at 1119.  The court of appeals held that a "multi-party

proceeding similar to the class action authorized by [Rule 23 of the Federal Rules] of Civil

Procedure" was permissible, because the judiciary has the inherent authority under the All Writs

Act, 28 U.S.C. § 1651, to fashion "expeditious methods of procedure in a specific case." *Id.* at

1125 (citing *Harris v. Nelson*, 394 U.S. 286, 294 (1969)); *see also Bertrand v. Sava*, 684 F.2d

204, 219 (2d Cir. 1982) (finding no error in the district court's decision to "certify a [habeas]

class of 'all Haitian aliens transferred from [an Immigration and Naturalization Service

facility] . . . , who have requested political asylum and parole, but have remained in respondent's

custody'" (citation omitted)).  Respondents contest the applicability of *Sero*, arguing that unlike

in that case, each Petitioner here relies on different medical conditions, and may have had

different levels of exposure to individuals infected with COVID-19.  Resp. Opp. at 13–14.  This

argument misapprehends Petitioners' claims.  Although they have different underlying illnesses,

Plaintiffs share an increased risk of serious complications if they contract the virus.  And this

case does not turn on the degree to which each Petitioner may have been exposed to infected

individuals; it turns on the alleged risk created by the conditions in the Essex County Jail, which is common to all Petitioners.

The Court remains convinced, therefore, that a procedure such as this multi-party habeas action is appropriate where Petitioners "shar[e] certain complaints about the legality" of their confinement. *Bertrand v. Sava*, 535 F. Supp. 1020, 1024 (S.D.N.Y. 1982) (citations omitted), *rev'd on other grounds*, 684 F.2d 204 (2d Cir. 1982); *see also id.* at 1024–25 ("Such initiative and flexibility are essential to modern use of the writ [of habeas corpus] in order to cut through barriers of form and insure that miscarriages of justice are corrected.").

Accordingly, Respondents' request to sever the action into three individual habeas petitions is DENIED.

II.   Venue

Respondents argue that they are not properly named in the petition, because although Petitioners are detained at the command and under the authority of Respondents, Respondents have contracted with a state facility to hold Petitioners. Resp. Opp. at 12. 28 U.S.C. § 2242 provides that an application for a writ of habeas corpus should be directed to "the person who has custody over [the applicant]." *See also* 28 U.S.C. § 2243 ("The writ, or order to show cause shall be directed to the person having custody of the person detained."). The Supreme Court has held that in challenges to detention, therefore, the proper respondent is the "person who has the *immediate custody* of the party detained, with the power to produce the body of [petitioner] before the court or judge." *Rumsfeld v. Padilla*, 542 U.S. 426, 435 (2004) (internal quotation marks and citation omitted). Respondents contend that Petitioners' immediate custodian is the warden of the Essex County Jail, the facility that housed them. Resp. Opp. at 12. And, because the Petitioners were detained in a New Jersey facility, Respondents argue that the Southern

5

District of New York is not the proper venue for their claims.  *Id.*; *see Padilla*, 542 U.S. at 451 (Kennedy, J., concurring) ("[W]hen an action is brought in the district court, it must be filed in the district court whose territorial jurisdiction includes the place where the custodian is located.").

The Court disagrees.  Though it remains an unsettled question, "courts in this [d]istrict have repeatedly recognized, in cases where a petitioner is detained in a non-federal facility pursuant to the power and authority of the federal government and under a contract with the federal government, the proper respondent is the federal official with the most immediate control over that facility."  *Cruz v. Decker*, No. 18 Civ. 9948, 2019 WL 4038555, at *3 (S.D.N.Y. Aug. 27, 2019) (internal quotation marks and citation omitted) (collecting cases), *aff'd*, No. 18 Civ. 9948, 2019 WL 6318627 (S.D.N.Y. Nov. 26, 2019).  Petitioners are held in a county jail under contract with ICE, but they are "in custody pursuant only to the power and authority of the federal government," and, therefore, the person with the power to produce their bodies and effect their release is "the *federal* official most directly responsible for overseeing the contract facility." *Rodriguez Sanchez v. Decker*, No. 18 Civ. 8798, 2019 WL 3840977, at *2 (S.D.N.Y. Aug. 15, 2019) (emphasis added) (internal quotation marks, citation, and alterations omitted); *see also You v. Nielsen*, 321 F. Supp. 3d 451, 461 (S.D.N.Y. 2018) ("Petitioner's immediate custodian is not the warden of the Bergen County Jail, but, in fact, ICE officials located in this district."); *Matias Madera v. Decker*, No. 18 Civ. 7314, 2018 WL 10602037, at *3 (S.D.N.Y. Sept. 28, 2018) ("[T]he ICE District Director represents the first and most immediate federal official who is able [to] respond to the petition and, if indicated, deliver the relief sought.").

In this case, "Field Office Director Decker [is] the federal official with the most immediate control over the non-federal facility in which Petitioner[s] [are] being detained," and is the proper respondent.  *Rodriguez Sanchez*, 2019 WL 3840977, at *4; *see also, e.g., Garcia v.*

*Decker*, No. 20 Civ. 1345, 2020 WL 1435007, at *2 (S.D.N.Y. Mar. 24, 2020) ("Respondent Decker is located within this [d]istrict and, as Director of the ICE NY Field Office, has control over [p]etitioner's detention."); *Matias Madera*, 2018 WL 10602037, at *4 ("Respondent Decker is thus [the] proper respondent in these proceedings, because he can order the release of [p]etitioner.").  And Decker's office is located within the territorial jurisdiction of this Court. *See* Petition ¶ 9.

Accordingly, Respondents' motion to dismiss Decker and to transfer Petitioners' claims to the District of New Jersey is DENIED.

However, "there is generally only one proper respondent to a given prisoner's habeas petition." *Padilla*, 542 U.S. at 434.  Unlike Decker, Wolf is the acting Secretary of Homeland Security, a "remote supervisory official" who does not have "immediate custody" of Petitioners. *Id.* at 435 (internal quotation marks and citation omitted); *see* Petition ¶ 10.  Because he is "only connected to Petitioner[s] as Decker's supervisor," he is "not a proper party to this case." *Matias Madera*, 2018 WL 10602037, at *4.

Accordingly, Wolf is DISMISSED from this action.

III.   Preliminary Injunction

A.  Legal Standard

A preliminary injunction sought against government action taken pursuant to a statute or regulatory scheme requires that "the moving party . . . demonstrate (1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, and (3) public interest weighing in favor of granting the injunction." *Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133, 143 (2d Cir. 2016).  "A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Faiveley Transp. Malmo AB*

*v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (internal quotation marks and citation omitted).

  B.  Analysis

   1.  Irreparable Harm

To establish irreparable harm, Petitioners "must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Id*. (internal quotation marks and citation omitted).  Petitioners have shown irreparable harm by establishing the risk of injury to their health and constitutional rights.  *See Barbecho v. Decker*, No. 20 Civ. 2821, 2020 WL 1876328, at *6 (S.D.N.Y. Apr. 15, 2020) ("[I]rreparable harm exists where, as here, petitioners face imminent risk to their health, safety, and lives." (internal quotation marks and citation omitted)).  The Court addresses each injury in turn.

   a.  Risk of Serious Illness or Death

Based on the record before it, the Court concludes that Petitioners would face a risk of serious illness or death if returned to civil immigration detention at the Essex County Jail.

   i.  Essex County Jail

As of the date of this opinion, there are more than 3.8 million confirmed cases of COVID-19 worldwide and over 1.25 million cases in the United States.  Center for Systems Science and Engineering at Johns Hopkins University, *Coronavirus COVID-19 Global Cases*, Coronavirus Resource Center (May 7, 2020), https://coronavirus.jhu.edu/map.html.  Some 267,996 people have died from the disease worldwide; at least 26,130 have died in New York. *Id*.  New Jersey also has a devastating outbreak of the virus, with 1,381 deaths in Essex County. New Jersey Dep't of Health, *New Jersey COVID-19 Dashboard*, Official Site of the State of

New Jersey (May 7, 2020), https://www.nj.gov/health/cd/topics/covid2019_dashboard. shtml (noting 133,635 confirmed cases and 8,801 deaths statewide).

The nature of detention facilities makes exposure and spread of the virus particularly harmful.  Gregg S. Gonsalves, Ph.D., an epidemiologist at the Yale School of Medicine and School of Public Health, submitted a declaration in this matter, discussing the conditions at the Essex County Jail, among others, after reviewing Centers for Disease Control and Prevention ("CDC") guidance, ICE guidance, and the declaration filed by the jail's director.  Gonsalves Decl. ¶¶ 3, 43, ECF No. 34-1.  It is Gonsalves' "professional judgment that individuals placed in these jails are at a significantly higher risk of infection with COVID-19 as compared to the population in the community and that they are at a significantly higher risk of harm if they do become infected." *Id.* ¶ 63.  Jaimie Meyer, M.D., M.S., who has worked extensively on infectious disease treatment and prevention in the context of jails and prisons, agrees; she submitted a declaration in another action in this district noting that the risk of COVID-19 to people held in New York-area detention centers "is significantly higher than in the community, both in terms of risk of transmission, exposure, and harm to individuals who become infected." Meyer Decl. ¶ 7, *Velesaca v. Wolf*, 20 Civ. 1803 (S.D.N.Y. Feb. 28, 2020), ECF No. 42.

This Court also recently concluded that vulnerable detainees at the Essex County Jail are at risk of serious illness or death, notwithstanding the additional measures taken at the facility. *Basank v. Decker*, No. 20 Civ. 2518, 2020 WL 1953847, at *6 (S.D.N.Y. Apr. 23, 2020).  A number of other courts in this district have also recognized the threat that COVID-19 poses to detained individuals, including the Essex County Jail.  *See, e.g.*, *Coronel*, 2020 WL 1487274, at *3 ("[B]eing in immigration detention places [p]etitioners at significantly higher risk of contracting COVID-19.  Individuals in carceral settings are at a 'significantly higher' risk of

spreading infectious diseases." (citation omitted)); *United States v. Stephens*, No. 15 Cr. 95, 2020 WL 1295155, at *2 (S.D.N.Y. Mar. 19, 2020) ("[I]nmates may be at a heightened risk of contracting COVID-19 should an outbreak develop.") (collecting authorities); *see also In the Matter of the Request to Commute or Suspend County Jail Sentences*, Case No. 84230 (N.J. Mar. 22, 2020) (holding that "reduction of county jail populations, under appropriate conditions, is in the public interest to mitigate risks imposed by COVID-19" in light of "the profound risk posed to people in correctional facilities arising from the spread of COVID-19").

ii.     Petitioners' Medical Conditions

Courts have recognized the health risk posed by COVID-19 to be particularly acute for detainees who have underlying illnesses.  *See Jones v. Wolf*, No. 20 Civ. 361, 2020 WL 1643857, at *13 (W.D.N.Y. Apr. 2, 2020) ("[P]etitioners with the CDC-identified vulnerabilities face a grave, irreparable risk to their health and safety if they remain confined under current conditions" in a facility where COVID-19 is spreading); *United States v. Martin*, No. 19 Cr. 140-13, 2020 WL 1274857, at *2 (D. Md. Mar. 17, 2020) ("[T]he Due Process Clauses of the Fifth or Fourteenth Amendments, for federal and state pretrial detainees, respectively, may well be implicated if defendants awaiting trial can demonstrate that they are being subjected to conditions of confinement that would subject them to exposure to serious (potentially fatal, if the detainee is elderly and with underlying medical complications) illness.").

The Court takes judicial notice that COVID-19 causes severe medical complications and has increased lethality among people with underlying health problems.  *People Who Are at Higher Risk for Severe Illness*, Centers for Disease Control and Prevention (Apr. 15, 2020), https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/high-risk-complications.html ("[P]eople of any age who have serious underlying medical conditions might be at higher risk for

severe illness from COVID-19."); *see* Fed. R. Evid. 201(b) ("The court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned."); *Basank*, 2020 WL 1953847, at *7 (taking judicial notice of medical conditions recognized by the CDC as resulting in increased risks of contracting COVID-19 or developing serious, and potentially fatal, complications from the virus).

Petitioners are at particular risk for severe illness or death, because their preexisting medical conditions make them more likely to develop serious complications due to COVID-19. Respondents do not dispute that Louis' breathing restrictions and chest injuries put him in the high-risk category, and that a doctor who examined him concluded that he faces grave consequences should he contract the virus.  Petition ¶ 6; *see* Resp. Opp. at 20–21.  Valenzuela Arias has a lump in his chest that requires surgery, which could render him significantly more vulnerable to COVID-19.  *See, e.g.*, S. Lei, *et al.*, *Clinical Characteristics and Outcomes of Patients Undergoing Surgeries During the Incubation Period of COVID-19 Infection*, EClinicalMedicine at 5 (2020), https://doi.org/10.1016/j.eclinm.2020.100331 ("The data in this study suggest that surgery may accelerate and exacerbate disease progression of COVID-19."). Moreover, there is a real possibility that his gynecomastia is a symptom of another serious illness that would increase his risk from the virus.  Pet. Reply at 10.  The Court rejects Respondents' assertion that Valenzuela Arias is not at heightened risk of COVID-19 complications because his condition is not listed on the CDC website.  Resp. Opp. at 21.

The risk that Petitioners will face a severe, and quite possibly fatal, infection in immigration detention constitutes irreparable harm warranting a preliminary injunction.  *See Barbecho*, 2020 WL 1876328, at *6 (concluding that detainees who "face a risk of severe,

irreparable harm—including death—if they contract COVID-19" met burden of showing irreparable harm); *Coronel*, 2020 WL 1487274, at *3 ("Due to their serious underlying medical conditions, all [p]etitioners [at Essex County Jail, among others,] face a risk of severe, irreparable harm if they contract COVID-19. . . . [B]eing in immigration detention places [p]etitioners at significantly higher risk of contracting COVID-19.  Individuals in carceral settings are at a 'significantly higher' risk of spreading infectious diseases." (citation omitted)); *Basank*, 2020 WL 1953847, at *7 (holding that immigration detainees at the Essex County Jail faced irreparable harm because of the threat of COVID-19); *Velesaca v. Decker*, No. 20 Civ. 2643, Order, ECF No. 29 (S.D.N.Y. Apr. 16, 2020) (granting immediate release of petitioner in light of the COVID-19 pandemic); *Nikolic v. Decker*, No. 20 Civ. 2500, ECF No. 19 at 1 (S.D.N.Y. Apr. 3, 2020) (ordering release of medically vulnerable individual in light of COVID-19).

### b.   Constitutional Violations

Second, Petitioners have also shown irreparable injury because they allege a violation of their constitutional rights.  In the Second Circuit, it is well settled that an alleged constitutional violation constitutes irreparable harm.  *See, e.g.*, *Connecticut Dep't of Envtl. Prot. v. O.S.H.A.*, 356 F.3d 226, 231 (2d Cir. 2004) ("[W]e have held that the alleged violation of a constitutional right triggers a finding of irreparable injury." (internal quotation marks and citation omitted)); *Statharos v. New York City Taxi & Limousine Comm'n*, 198 F.3d 317, 322 (2d Cir. 1999) ("Because plaintiffs allege deprivation of a constitutional right, no separate showing of irreparable harm is necessary."); *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996) (clarifying that "it is the alleged violation of a constitutional right that triggers a finding of irreparable harm" and a substantial likelihood of success on the merits of a constitutional violation is not necessary);

*Sajous v. Decker*, No. 18 Civ. 2447, 2018 WL 2357266, at *12 (S.D.N.Y. May 23, 2018) (finding that immigration detainee established irreparable injury by alleging that prolonged immigration detention violated his constitutional due process rights).

The Court finds, therefore, that Petitioners have established the threat of irreparable harm absent the preliminary injunction.

### 2.   Likelihood of Success on the Merits

Petitioners argue that a return to confinement in the Essex County Jail would violate their due process rights.  Pet. Reply at 10–15.  The Court agrees.  Notwithstanding the steps that have been taken at the facility since the Court issued its TRO, Petitioners have met their burden of showing a likelihood of success on the merits.

### a.   Legal Standard

The Due Process Clause of the Fifth Amendment to the United States Constitution forbids the government from depriving a person of life, liberty, or property without due process of law.  The protection applies to "all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001).  An application for habeas corpus under 28 U.S.C. § 2241 is the appropriate vehicle for an inmate in federal custody to challenge conditions or actions that pose a threat to his medical wellbeing.  *See Roba v. United States*, 604 F.2d 215, 218–19 (2d Cir. 1979) (allowing a § 2241 application to challenge an inmate's "transfer while seriously ill" where that transfer posed a risk of fatal heart failure).

Immigration detainees can establish a substantive due process violation for unmet medical needs by showing that a government official "knew, or should have known" of a condition that "posed an excessive risk to health," and failed to take appropriate action.  *Darnell*

*v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017).  "Deliberate indifference" to serious medical needs "can be established by either a subjective or objective standard:  A plaintiff can prove deliberate indifference by showing that the defendant official recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, *or should have known*, that the condition posed an excessive risk to the plaintiff's health or safety."  *Charles v. Orange Cty.*, 925 F.3d 73, 87 (2d Cir. 2019) (internal quotation marks, citation, and alterations omitted).

Additionally, the Supreme Court has recognized that government authorities may be deemed "deliberately indifferent to an inmate's current health problems" where they "ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year," including "exposure of inmates to a serious, communicable disease," even when "the complaining inmate shows no serious current symptoms."  *Helling v. McKinney*, 509 U.S. 25, 33 (1993).  Petitioners need not demonstrate that "they actually suffered from serious injuries" to show a due process violation.  *Darnell*, 849 F.3d at 31; *see Helling*, 509 U.S. at 33.  Instead, showing that the conditions of confinement "pose an unreasonable risk of serious damage to their future health" is sufficient.  *Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002) (quoting *Helling*, 509 U.S. at 35 (alteration omitted)).

### b.  Analysis

Respondents argue that ICE has set in motion various steps to improve health and sanitation at the Essex County Jail, and have submitted the declaration of the facility's warden attesting to the actions taken.  *See* Ortiz Decl.  They point out that the Essex County Jail has implemented health and temperature checks for all detainees who enter the facility, provided additional on-site medical staff, obtained testing kits, obtained protective equipment and supplies,

educated staff, inmates, and detainees on best practices, put into place new food service protocols (including no longer permitting detainees or inmates to work in the kitchens), increased cleaning, suspended classes and religious services led by volunteers, and limited attorney visits to window visits only.  Resp. Opp. at 8–10; *see also* Ortiz Decl. ¶¶ 8–9, 15–21.  Respondents contend that these measures undercut Petitioners' deliberate indifference claim.  Resp. Opp. at 15–20.

The standard for deliberate indifference, however, is not one of malice.  Rather, Petitioners may establish deliberate indifference through intentional denial of care (the subjective standard), *or* by showing that Respondents "recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the [Respondents] knew, or should have known, that the condition posed an excessive risk to [the Petitioners'] health or safety" (the objective standard).  *Charles*, 925 F.3d at 87.[3]  Based on the record before it, the Court concludes that the inadequate measures implemented by Respondents amount to a reckless failure to act with reasonable care to protect Petitioners as high-risk individuals.[4]

---

[3] Respondents imply that in *Charles*, the Second Circuit held that the Court may find deliberate indifference only if, in addition to finding that Respondents have objectively failed to act with reasonable care, the Court separately finds that their actions "shock[] the contemporary conscience."  Resp. Opp. at 16 (internal quotation marks omitted).  That is not the law.  Instead, the Second Circuit has explicitly stated that, with respect to a claim of unmet medical needs by detainees, once deliberate indifference is shown, a "court need not . . . conduct a separate analysis, over and above the deliberate indifference analysis, of whether the state's conduct 'shocks the conscience.'"  *Charles*, 925 F.3d at 86; *see id.* n.11 (clarifying that the court of appeals has applied "separate 'shocks the conscience' analysis in cases that do not involve the medical needs of those the state has taken into custody").  In other words, the failure to take objectively necessary measures to protect vulnerable inmates from a deadly pandemic is *per se* conscience-shocking.  *See id.* at 86 ("The Supreme Court has held that the point of conscience shocking is reached when government actors are deliberately indifferent to the medical needs of pretrial detainees.").

[4] The Court concludes that Petitioners have established a likelihood of success on the merits on their substantive due process claim, both articulated as a conditions of confinement claim, *see Helling*, 509 U.S. at 33 (discussing a conditions of confinement claim and raising "exposure of inmates to a serious, communicable disease" as an example), as well as an unmet medical needs claim, *see Charles*, 925 F.3d at 87 (discussing deliberate indifference to medical needs).  Indeed, where, as here, a communicable disease renders the general conditions of confinement dangerous to Petitioners' health, and meeting Petitioners' medical needs requires that Respondents take specific measures to prevent their infection, the conditions of confinement and unmet medical needs claims essentially merge.

First, the Court finds that Respondents have not put into place adequate measures to identify, protect, and treat detainees who are at a heightened risk of contracting or suffering grave complications from COVID-19.  Respondents indicate that vulnerable detainees "are being housed separately," and that staff working with them wear personal protective gear.  Ortiz Decl. ¶ 33.  But detainees are designated as high-risk only if, in the facility's judgment, they have "chronic conditions that place them at higher risk for COVID-19" *and* "those conditions are not well-controlled."  Ortiz Supp. Decl. ¶ 18, ECF No. 33-2.  It is not clear how the facility determines which underlying illnesses are "well-controlled," nor is there any evidence in the record that demonstrates that an inmate with a "well-controlled" chronic condition is not still at increased risk of experiencing complications from a COVID-19 infection.

Moreover, Respondents cannot provide assurances that COVID-19 is not already present among the separately housed vulnerable population.  Although Respondents assert that they engage in "daily monitoring" of high-risk detainees, Ortiz Decl. ¶ 15(f), and "increased monitoring" of the detainee population as a whole, *id.* ¶ 15(g), there is evidence that the facility's procedures are not thorough.  For example, detainees recently released from the Essex County Jail report that individuals with apparent COVID-19 symptoms remained among the general population.  *See* Khan Decl. ¶ 15, ECF No. 34-3 (reporting that after reporting that he was "feeling generalized pain, muscle aches, and had lost [his] sense of taste and smell . . . [n]obody took [his] temperature or gave [him] a blood test"); *id.* ¶¶ 12, 14 (describing other sick detainees who were untreated and kept in the general population); Perez Decl. ¶ 12, ECF No. 34-4 ("While I was [in the Essex County Jail], I can think of about eight people who were sick with headaches and fevers, which I understand are symptoms of coronavirus.  It would take four or five days for these men to go to medical and while they waited, they were still in the dorms around other

people.").  In any event, when it comes to vulnerable detainees like Petitioners, monitoring them for signs of infection is too little, too late.  *See also* Gonsalves Decl. ¶ 52 n.71  (noting that the facilities fail to explain "who conducts that monitoring, how, when, or where it is conducted, or what steps are taken if a person exhibits symptoms of COVID-19 infection").  The best, and perhaps only, way to protect them is to prevent infection in the first place.  Respondents have not taken meaningful steps to do so.

Second, with respect to general conditions of confinement, the evidence submitted by Respondents does not indicate that social distancing is being practiced in various daily situations inside the Essex County Jail.  *See How to Protect Yourself & Others*, Centers for Disease Control and Prevention (Apr. 24, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prepare/prevention.html (recommending maintaining at least six feet of distance from other persons at all times and noting that "[k]eeping distance from others is especially important for people who are at higher risk of getting very sick").  Detainees sleep in either a cell with a bunk bed, or in a dorm, which includes "bunks around the perimeter of the dorm" with "a seating area and recreation yard" in the center of the dorm.  Ortiz Decl. ¶ 6.  The facility's director concedes that the top and bottom bunks of each bed are separated by less than six feet, and that the beds, which are bolted to the ground, are also less than six feet apart from each other.  Ortiz Supp. Decl. ¶ 7; *see* Picasso Decl. ¶ 6, ECF No. 3-3 (noting that detainees in Essex County Jail sleep "very close together—two people in a small room with bunk beds"); Khan Decl. ¶ 7 ("The dorm is one big hall and there are about 48 people in our dorm. . . . I was always within six feet from other people no matter where I went in the dorm."); Perez Decl. ¶ 4 (The cells were small and I was very close to my cellmate – I could not stay six feet away from him in the cell.").  Moreover, even in the common areas, it does not appear that detainees can consistently practice

social distancing.  Perez Decl. ¶ 6 ("When we were out of our cells, the group of 30 people would use the phones, the bathrooms and the microwave. . . . We were always very close to one another and always within six feet of one another."); Picasso Decl. ¶¶ 4–5 (attesting that it was "impossible to maintain six feet of distance" in the common space); Pena Decl ¶¶ 4–5, ECF No. 3-2 (averring that even after the facility reduced the number of inmates who could be out of their cell at any given time, "the dorms weren't big enough for us to stay away from people and we would still come into contact with them—people would group in lines waiting for the phone and the bathrooms.  It was impossible to stay away from people even if I wanted to because the room just wasn't big enough.").  Gonsalves opines that "[g]enerally social distancing is impossible to obtain in a jail or prison setting, and none of the ICE declarations provide any evidence to alter my view."  Gonsalves Decl. ¶ 56.  Attempts to practice social distancing are also for naught when detainees are forced to come into contact with surfaces that may have been touched by symptomatic individuals or items that belong to symptomatic individuals.  *See* Khan Decl. ¶ 12 (attesting that when a symptomatic individual was removed from the general population and placed in quarantine, staff at the facility asked the detainees to pick up the symptomatic individual's belongings, without any protective equipment); *see also* Gonsalves Decl. ¶ 55 ("[W]hile efforts to increase cleaning are admirable, in my opinion the frequencies for cleaning outlines are still inadequate. Rather than cleaning surfaces a handful of times each day, surfaces should be wiped down with disinfecting chemicals on a continual basis each time they are touched to prevent the spread of the virus.").

Third, the Essex County Jail uses "cohorting" to separate possibly infected detainees. But instead of isolating each individual, the facility groups them together.  *See* Ortiz Decl. ¶ 21. This practice risks spreading the virus to otherwise healthy inmates.  *See* Gonsalves Decl. ¶ 47.

Respondents complain that in granting the TRO, the Court "misinterpret[ed] [the Essex County Jail's] practices and CDC guidance as pertains to the 'cohorting' of detainees," Resp. Opp. at 17, because the Court found that the Essex County Jail's practice of cohorting individuals with potential exposure to the virus was not in line with the CDC's admonition that "[o]nly individuals who are laboratory confirmed COVID-19 cases should be placed under medical isolation as a cohort." *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, Centers for Disease Control and Prevention (Apr. 18, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html; *see Valenzuela Arias*, 2020 WL 1847986, at *4. Respondents argue that the CDC also indicates that correctional facilities may cohort exposed individuals as a last resort, so long as they are not cohorted with confirmed cases.  Resp. Opp. at 17–18; *see Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*.  There is no evidence in the record that individually quarantining exposed detainees would be impossible.  But more to the point, if vulnerable detainees with underlying illnesses face the possibility of being cohorted with others who may or may not be infected with COVID-19, then the vulnerable detainees face an increased risk of infection with the virus.[5]  The cohorting practice described, therefore, does not adequately protect Petitioners.

Fourth, Respondents' assurance that the Essex County Jail is "testing its entire population using rapid antibody screening," Ortiz Decl. ¶ 32, provides no solace.  The facility's medical director explains that population-wide testing is underway using "[a]ntibody blood tests, which are also called serology tests," Anicette Decl. ¶ 8, as a "screening tool to determine appropriate

---

[5] Indeed, a court in this district recently described a similar cohorting practice as a "Kafkaesque approach" that "will inevitably permit the virus to spread."  *United States v. Scparta*, No. 18 Cr. 578, 2020 WL 1910481, at *1 (S.D.N.Y. Apr. 20, 2020).

housing conditions," *id.* ¶ 11.  The Essex County Jail first tested all new admissions, then

detainees deemed to be high-risk, and is now in the process of testing the remainder of the

population.  *Id.* ¶ 13.  The facility quarantines for 14 days any individual who tests positive for

certain antibodies associated with COVID-19.  *Id.* ¶ 15.  This procedure is deeply flawed, as

Meyer explains in her supplemental declaration.  *See* Meyer Supp. Decl., ECF No. 34-2.  Meyer

attests that it can take more than a week after infection for a person to develop the relevant

antibodies, and even then, a number of confounding factors might lead to the non-development

of those antibodies.  *Id.* ¶ 18.  As a result, "when it comes to assessing whether or not a person

currently has COVID-19, a negative test result tells us nothing more than if we had not done a

test in the first place.  One cannot be reassured by a negative test.  At most, it would be evidence

that the individual did not have COVID-19 or was not exposed to it approximately 2 weeks ago."

*Id.* ¶ 19.  Further, "an antibody test still cannot tell us whether or not someone actually has the

virus or is contagious to others," because "[t]here is evidence that people can be contagious for

weeks before they develop symptoms and for weeks after they have recovered from COVID-19."

*Id.* ¶ 23.  For this reason, Meyer opines that the Essex County Jail "is currently misinterpreting

and misusing the results of these antibody tests in a way that puts detained persons and staff at

significantly greater risk of harm related to COVID-19," because it is likely to result in

contagious individuals being housed with healthy ones, and insufficient measures being taken to

protect detainees wrongly classified as immune.  *Id.* ¶ 30; *see id.* ¶¶ 31–42 (describing in detail

the diagnostic errors in the Essex County Jail's testing plan).[6]  Indeed, in her expert opinion, the

---

[6] Gonsalves corroborates Meyer's assessment:

> It is also particularly concerning that Essex County Jail plans to use serologic, or so-called
> antibody, testing of detainees to make critical decisions about how to house and isolate its
> population.  Although Essex County Jail touts this plan as a sign of its commitment to
> comprehensive testing, antibody testing should not be used to diagnose active infection (PCR-
> based antigen tests are used for that) nor as a way to ascertain if someone has been exposed to or

Essex County Jail's "testing protocol would significantly increase the risk of COVID-19 in the facility *more so than if there was no testing at all*." *Id.* ¶ 48 (emphasis added).

Finally, the Court is not persuaded that it should draw an inference in Respondents' favor based on what Respondents characterize as swift action by ICE to identify and release vulnerable detainees. Resp. Opp. at 18. For one, this Court is not alone in finding that the pace of ICE's response demonstrates deliberate indifference to the needs of those in its custody. *See Fraihat v. U.S. Immigration & Customs Enf't*, No. 19 Civ. 1546, 2020 WL 1932570, at *22 (C.D. Cal. Apr. 20, 2020) ("[ICE] made an intentional decision to promulgate only non-binding guidance for the first month of the pandemic, despite some knowledge of the risk posed by COVID-19. The March 6, March 27, and April 4, 2020 ICE guidance documents illustrate [ICE's] awareness of a grave risk, but their failure to mandate a facility-wide response."). But more importantly, ICE did not release the Petitioners before the Court. The question presented is whether the conditions in which Respondents seek to hold *these Petitioners* exhibit a reckless disregard for *their* health, taking into account their preexisting medical conditions. That ICE has released other individuals is not relevant.

A number of courts in this district and beyond have held that habeas petitioners have demonstrated a likelihood of success under similar conditions. In *Basank v. Decker*, this Court ordered immediate release of ten individuals detained in ICE custody at county jails in New

---

recovered from or is immune from SARS-COV-2. The CDC, the Food and Drug Administration ("FDA"), and the World Health Organization ("WHO") all warn against using antibody tests to determine whether an individual is infected or was previously infected with COVID-19. The New York City Department of Health and Mental Hygiene recently warned healthcare providers that "serologic tests should not be used to diagnose acute or priors SARS-CoV-2 infection, nor should they be used to determine immune status to SARS-CoV-2. Due to the prevalence of false results (e.g. false positive and false negatives), the uncertainty, in fact, lack of evidence to support even a true positive results' association with immune protection, relying on serologic tests in this way may in fact increase exposure to COVID-19 among detainees at Essex County Jail.

Gonsalves Decl. ¶ 50 (internal quotation marks and citations omitted).

Jersey, including the Bergen and Essex County Jails. No. 20 Civ. 2518, 2020 WL 1481503, at *4 (S.D.N.Y. Mar. 26, 2020); *see also Basank*, 2020 WL 1953847, at *13 (converting TRO into preliminary injunction on supplemented record).  In *Coronel*, another court in this district released seven ICE detainees, including detainees at the Essex County Jail, due to their underlying medical conditions, which include obesity, hypertension, and gastrointestinal problems, in light of ICE's insufficient steps to protect high-risk detainees.  2020 WL 1487274, at *1, *10.  The same critical deficiencies have led other courts in this district to find a likelihood of success on the merits of a deliberate indifference claim brought by ICE detainees.  *See Velesaca v. Decker*, No. 20 Civ. 2643, TRO Hr'g Tr. at 23:10–15, ECF No. 30 (S.D.N.Y. Apr. 13, 2020) ("[A]lthough the record reflects the respondents have taken general proactive steps to prevent the spread of COVID-19 in the Orange County Correctional Center, consistent with other courts in this district, I find such measures are unresponsive to [petitioner's] needs as a high-risk individual"); *Barbecho*, 2020 WL 1876328, at *4 (ordering release of detainees because "beyond [a] custody re-assessment, [r]espondents have failed to offer any evidence of measures designed to address the needs of those high-risk detainees who ICE has re-assessed and determined should remain in ICE custody"); *Avendaño Hernandez v. Decker* No. 20 Civ. 1589, 2020 WL 1547459, at *2–3 (S.D.N.Y. Mar. 31, 2020) (holding that an immigration detainee had established a "substantial claim for deliberate indifference" where ICE and the county jail in which he was held had "not taken any action to address the particular risks that COVID-19 poses to high-risk individuals," but rather had taken "only generalized proactive measures to prevent detainees within [their] care from contracting and spreading the virus").[7]

---

[7] Courts in other districts have also found that ICE detainees have shown a likelihood of success on their claims that continued confinement, without adequate protection for their health, violates their due process rights.  In *Hope v. Doll*, a court granted the immediate release of 22 immigration detainees held at facilities with reported COVID-19 cases, finding that "the protective measures in place . . . are not working."  No. 20 Civ. 562, ECF. No. 11 at 13 (M.D.

To be clear, the Court does not hold that the CDC's guidelines amount to strict rules of constitutional law that Respondents must follow in every circumstance. *Contra* Resp. Opp. at 15–16. The Court does, however, take the numerous ways in which the Essex County Jail has failed to implement protective measures for high-risk individuals to be an overwhelming indication that the conditions of confinement are dangerous to detainees like Petitioners, and that their specific medical needs as vulnerable individuals would go unmet in custody. Thus, as the Court previously concluded, "Respondents know, or should know, that [the steps taken so far] are not enough to protect vulnerable detainees like Petitioners from an unreasonable risk of serious damage to their health." *Valenzuela Arias*, 2020 WL 1847986, at *8.

The Court holds, therefore, that Petitioners are likely to succeed on the merits of their due process claim that Respondents knew or should have known that Petitioners' conditions of confinement pose excessive risks to their health and that their specific medical needs were unmet.[8]

---

Pa. Apr. 7, 2020). As the court explained, "[i]t now seems that our worst fears have been realized—COVID-19 is spreading, and not nearly enough is being done to combat it. We cannot allow the [p]etitioners before us, all at heightened risk for severe complications from COVID-19, to bear the consequences of ICE's inaction." *Id.* at 19. A court in that same district released 13 individuals from ICE detention, who suffered from medical conditions such as high blood pressure, diabetes, asthma, and trouble breathing. *Thakker v. Doll*, No. 20 Civ. 480, 2020 WL 1671563, at *1, *10 (M.D. Pa. Mar. 31, 2020). In finding that the petitioners had shown a likelihood of success on the merits, the court noted that the petitioners had demonstrated that, "despite their best efforts, they cannot practice these effective preventative measures in [detention] [f]acilities." *Id.* at *8. "Considering . . . the grave consequences that will result from an outbreak of COVID-19, particularly to the high-risk [p]etitioners in this case," the court determined that it "cannot countenance physical detention in such tightly-confined, unhygienic spaces." *Id.* In *Malam v. Adducci*, the court released an ICE detainee, notwithstanding the precautionary measures taken by the facility, because the petitioner was "not ensured anything close to reasonable safety." No. 20 Civ. 10829, 2020 WL 1672662, at *12 (E.D. Mich. Apr. 5, 2020), *as amended* (Apr. 6, 2020) (internal quotation marks and citation omitted). The court found that "the only reasonable response by [r]espondents is the release of [p]etitioner; any other response demonstrates a disregard of the specific, severe, and life-threatening risk to [p]etitioner from COVID-19." *Id.*

[8] The Court does not reach Petitioners' additional argument that they are likely to succeed on the merits of the claim that their due process rights were violated because the facilities' conditions are punitive. Pet. Reply at 13–14.

3.   Balance of Equities and Public Interest

The equities and public interest weigh heavily in Petitioners' favor.  Petitioners face

irreparable injury—to their constitutional rights and to their health.

The potential harm to Respondents is limited.  Respondents have not identified a specific

danger to the public or risk of flight that necessitates returning Petitioners to confinement in an

ICE detention facility.  *See generally* Resp. Opp.  In any event, the Court has imposed strict

conditions of release that fully address any such concerns.  *See* ECF Nos. 20, 21.  Respondents

note that Valenzuela Arias was mandatorily detained pursuant to 18 U.S.C. § 1226(c).  Resp.

Opp. at 4–5.  However, courts have the authority to order those detained in violation of their due

process rights released, notwithstanding § 1226(c).  *See Cabral v. Decker*, 331 F. Supp. 3d 255,

259 (S.D.N.Y. 2018) (collecting cases).  As such, Respondents have failed to justify Petitioners'

detention in unsafe conditions.

Finally, the public interest favors Petitioners' release.  Petitioners were confined for civil

violations of the immigration laws.  In the current crisis, public health and safety are best served

by rapidly decreasing the number of individuals held in confined, unsafe conditions.  As another

court in this district has observed, "[d]ecreasing the [ICE detention] population will . . . 'mitigate

the damage' to both the [j]ail and the surrounding community and thereby 'reduce the death toll.'"

*Barbecho*, 2020 WL 1876328, at *7 (quoting *United States v. Nkanga Nkanga*, No. 18 Cr. 713,

2020 WL 1529535, at *1 (S.D.N.Y. Mar. 31, 2020)).  "Indeed, reducing the size of the

population in jails and prisons reduces the level of risk both for those within those facilities and

for the community at large."  *Id.* (internal quotation marks, citation, and alterations omitted).

Respondents argue that the public interest is disserved by "constitutionalizing" the

Government's response to a public health crisis.  Resp. Opp. at 22.  Suffice it to say that the

constitutional requirement that the Government eliminate "a condition of confinement that is sure or very likely to cause serious illness and needless suffering" for those it has chosen to imprison is not a novel one. *Helling*, 509 U.S. at 33. When that fundamental obligation is violated, there is no public interest in turning a blind eye. Rather, "the public interest lies with the enforcement of the Constitution." *Ligon v. City of New York*, 925 F. Supp. 2d 478, 541 (S.D.N.Y. 2013).

Accordingly, the Court holds that Petitioners have established their entitlement to a preliminary injunction under Rule 65 of the Federal Rules of Civil Procedure.[9]

IV.     *Mapp v. Reno*

Even if Petitioners had not met the requirements for a preliminary injunction, the Court would release them on bail pending final resolution of their habeas claims under the Second Circuit's decision in *Mapp v. Reno*, 241 F.3d 221, 226 (2d Cir. 2001). In *Mapp*, the Second Circuit held "that the federal courts have inherent authority to admit to bail individuals properly within their jurisdiction" including immigration detainees petitioning for habeas relief. *Id.* A habeas petitioner's "fitness for bail" depends on "whether the habeas petition raises substantial claims and whether extraordinary circumstances exist that make the grant of bail necessary to make the habeas remedy effective." *Id.* at 230 (internal quotation marks, citation and alteration omitted).

For the reasons already stated, Petitioners' habeas claims are plainly substantial. Indeed, as the Court has already held, they are likely to succeed on the merits. And releasing Petitioners

---

[9] Respondents argue that granting a preliminary injunction would improperly give Petitioners "the ultimate relief [they] seek[]." Resp. Opp. at 23 (quoting *WarnerVision Entm't Inc. v. Empire of Carolina, Inc.*, 101 F.3d 259, 261 (2d Cir. 1996) (internal quotation marks omitted)). But the purpose of a preliminary injunction is to "prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits." *WarnerVision*, 101 F.3d at 261 (internal quotation marks and citation omitted). The Court has determined that the only way to prevent irreparable harm to Petitioners pending final adjudication of this action is to release them from an unsafe detention facility.

from confinement pending final adjudication of their petition is necessary to "make the habeas remedy effective." *Id.* "Severe health issues have been the prototypical but rare case of extraordinary circumstances that justify release pending adjudication of habeas." *Coronel*, 2020 WL 1487274, at *9 (collecting cases); *see, e.g.*, *Barbecho*, 2020 WL 1876328, at *8 ("If these Petitioners—whose medical conditions place them at a higher risk of severe illness, or death, from COVID-19—were to remain detained, they would face a significant risk that they would contract COVID-19—the very outcome they seek to avoid. Release is therefore necessary to make the habeas remedy effective." (internal quotation marks and citation omitted)); *United States v. Nkanga*, No. 18 Cr. 713, 2020 WL 1695417, at *3 (S.D.N.Y. Apr. 7, 2020) (granting bail pending resolution of a habeas claim under 28 U.S.C. § 2255 given "the defendant's age; his multiple health issues; the nature of the defendant's offense; [and] the precise timing of the sentencing proceeding (which occurred on March 12, 2020) in relation to the emerging COVID-19 pandemic" (internal quotation marks and citation omitted)).  Detention of Petitioners pending final adjudication of this action could cause severe illness or death—precisely the harm their petition seeks to avert.  The effectiveness of the habeas remedy can only be preserved, therefore, by Petitioners' remaining released for the duration of this matter.

Accordingly, the Court holds, in the alternative to granting Petitioners' motion for a preliminary injunction, that bail is imposed pending final resolution of their petition for habeas corpus.  Their bail conditions shall be the same as the conditions set in the TRO, and extended by the preliminary injunction.

## CONCLUSION

For the reasons stated in this opinion, it is hereby ORDERED that:

1. Petitioners' request for a preliminary injunction is GRANTED as follows:

   a. Petitioners shall remain released, subject to the conditions already set by the Court, and

   b. Respondents are RESTRAINED from arresting Petitioners for civil immigration detention purposes unless Respondents first obtain the Court's permission; [10]

2. Wolf is DISMISSED from this action; and

3. The preliminary injunction shall remain in effect until further order of the Court.

   SO ORDERED.

Dated: May 8, 2020
       New York, New York

_____
ANALISA TORRES
United States District Judge

---

[10] Respondents argue that the preliminary injunction should not prohibit Respondents from rearresting Petitioners if they determine that the public health crisis is over, or if Petitioners violate the terms of their release.  Resp. Opp. at 22–25.  Perhaps those occurrences would warrant an application to the Court for a modification of this order.  But the Court shall not pass on the hypothetical circumstances that might allow redetention.